IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SKY TOXICOLOGY, LTD., SKY TOXICOLOGY LAB MANAGEMENT, LLC, FRONTIER TOXICOLOGY, LTD., FT LAB MANAGEMENT LLC, HILL COUNTRY TOXICOLOGY, LTD., ECLIPSE TOXICOLOGY, LTD., ECLIPSE LAB MANAGEMENT, LLC, AXIS DIAGNOSTICS, INC., | § § § § § § § § § | |
| *Plaintiffs*, | § § | |
| | § | 5-16-CV-01094-FB-RBF |
| vs. | § § | |
| UNITEDHEALTHCARE INSURANCE COMPANY, UNITEDHEALTHCARE OF TEXAS, INC., UNITEDHEALTHCARE OF FLORIDA, INC., UNITEDHEALTHCARE SERVICES, INC., | § § § § § § § | |
| *Defendants*. | § § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns Plaintiffs' Motion to Dismiss Counterclaims of Defendants Pursuant to FRCP 12(b)(1), 12(b)(6), and 12(b)(7). Dkt. No. 8. All pretrial matters in this ERISA litigation, which also involves pendant state law claims, have been referred to the undersigned for disposition pursuant to Rules CV-72 and 1 to Appendix C of the Local Rules for the United States District Court for the Western District of Texas. *See* Dkt. No. 13.[1] The undersigned has authority to enter this report and recommendation pursuant to 28 U.S.C.

---

[1] This case was originally referred to U.S. Magistrate Judge Henry Bemporad but was administratively assigned to the undersigned upon Judge Bemporad's recusal.

§ 636(b)(1)(B). For the reasons discussed below, the undersigned recommends that Plaintiffs' Motion, Dkt. No. 8, be **DENIED**. Defendants' state-law claims are not preempted, Defendants' claims for fraud and fraudulent non-disclosure and negligent misrepresentation are otherwise properly pleaded, and Plaintiffs have failed to meet their burden in proving dismissal is appropriate pursuant to Rule 12(b)(7). Although Defendants have failed to sufficiently plead their claim for tortious interference with existing contracts, dismissal of this claim is not appropriate at this early stage. Rather, Defendants should be permitted an opportunity to re-plead this claim with additional factual details.

## I.     Factual and Procedural Background

This case arises out of claims submitted by five separate independent toxicology labs and their three general partners (collectively, the "Labs") to four different UnitedHealthcare Insurance entities (collectively, "United") in connection with toxicology services provided by the Labs to United's insureds. United provides healthcare insurance to individuals across the country through plans they administer.[2]

United originally sued the Labs, their officers, and several of their limited partners in the Southern District of Florida, raising various state law claims alleging unfair business practices or fraud and seeking equitable and injunctive relief under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. ¶ 1132(a)(3). *See UnitedHealthcare Ins. Co. v. Sky Toxicology, Ltd.*, No. 9:16-CV-80649, 2016 WL 8969042 (S.D. Fla. Nov. 1, 2016). The Southern District of Florida dismissed the action without prejudice for lack of subject matter jurisdiction. *Id.* at *1. Specifically, the court found United lacked standing to assert any ERISA claims because it was not acting as a plan fiduciary. *Id.* at *3. Although the court found that United's

_____

[2] Some United plans are both administered and fully-funded by United. *See* Counterclaims ¶ 31.

state law claims were *not* preempted by ERISA, it dismissed those claims without prejudice for lack of jurisdiction. *Id.* at *1-3.

The Labs then instigated the present action in this Court, alleging that United failed to "properly" pay them "millions of dollars" on "thousands of claims" submitted on behalf of "thousands of United members" for allegedly medically necessary testing conducted "[o]ver the course of several years." Amend. Compl. ¶¶ 28, 67-72. The Labs bring a number of claims against United under various ERISA provisions, the Texas Insurance Code, and Texas common law.

United asserted various counterclaims against the Labs, based on alleged misrepresentations and omissions committed when the Labs submitted more than $56 million in claims to United. According to United, the Labs engaged in a massive, complex kickback scheme through which they bribed medical providers and treatment facilities with thousands of dollars per month to entice them to order expensive, unnecessary toxicology tests for United's members from the Labs' out-of-network labs. Counterclaims ¶¶ 2, 49. Specifically, the Labs allegedly induced their referral sources to order "blanket testing" untethered to patients' specific medical histories, clinical indications, and treatment options. *Id.* ¶¶ 3, 83-84, 165, 254, 258. This included "perform[ing] confirmation tests on every specimen, even where qualitative screens showed that the specimen was negative for any drugs and/or where there were no unexpected results in the qualitative screen." *Id.* ¶ 259. This scheme, according to United, permitted the Labs to perform and then bill United for a host of expensive, unnecessary tests. *Id.* ¶¶ 253-54.

The Labs then allegedly disguised these kickbacks to referral sources as legitimate investment distributions. All investment distributions, however, were directly tied to the number of testing requests ordered. *Id.* ¶¶ 2, 82, 89-309. If a limited partner's testing requests were

down, the Labs would pressure them to send more requests, threaten to rescind their limited partnership shares, or unilaterally withhold distributions. *Id.* ¶ 102-108, 162-63. Conversely, if a limited partner increased the number of specimens sent for this "blanket testing," they were rewarded with the opportunity to purchase additional shares. *Id.* ¶ 111-12, 164.

Because the Labs were out-of-network providers, patients who used their testing services should have been financially responsible for the difference in what the Labs charged and the amount United ultimately paid. *Id.* ¶¶ 4, 42 , 78. According to United, "it relies heavily on its members' sensitivity to the greater out-of-pocket costs to ensure that members seek OON [out-of-network] providers' services *only* when they are medically necessary and reasonably priced." *Id.* ¶ 46 (emphasis in original). But realizing that "their scheme would crumble if patients had to pay for part or all of their overpriced and unnecessary toxicology testing service," the Labs allegedly had a policy of writing off all patient account balances. *Id.* ¶ 290.

In sum, the Labs allegedly submitted tens of thousands of claims to United for unnecessary and expensive out-of-network toxicology services. Each claim, according to United, "misrepresented (or intended to create the false impression) that the services performed were necessary, misrepresented (or intended to create the false impression) that the amount listed was the amount owed by UHC's [United's] member, and intentionally omitted that the services were induced by kickbacks [to the referral source]." *Id.* ¶¶ 123-125, 128, 130-132, 134-147, 150, 175, 195, 210, 214, 217, 240-42, 252, 277. The Labs, it is alleged, also would often submit claims that misrepresented (or intended to create the false impression) that the listed medical provider had actually authorized the testing service when no such physician authorization was actually provided. *Id.* ¶¶ 84, 279, 282, 287.

United asserts claims against the Labs for (1) fraud and fraudulent non-disclosure under Texas common law (Counterclaims 1A-E); (2) violation of the Texas Theft Liability Act, Tex. Prac. & Rem. Code § 134.001 *et seq.* (Counterclaim 2); (3) negligent misrepresentation (Counterclaim 3); tortious interference with contract (against only Plaintiffs Frontier Toxicology, Ltd. and Hill Country Toxicology, Ltd.) (Counterclaim 4); unjust enrichment (Counterclaim 5); money had and received (Counterclaim 6); a declaratory judgment under 29 U.S.C. § 1132(a)(3) that the claims submitted, which have been denied by United, were properly denied and are not covered or payable pursuant to the plan terms' provisions, and, for plans not governed by ERISA, a declaration that the denied claims were properly denied and are not payable pursuant to 28 U.S.C. § 2201 and Tex. Civ. Prac. & Rem. Code § 37 (Counterclaim 7); a permanent injunction pursuant to 29 U.S.C. § 1132(a)(3), which prohibits the Labs from submitting claims that violate the terms of United's ERISA plans and for all non-ERISA plans, an injunction pursuant to Tex. Civ. Prac. & Rem. Code § 64.011, which provides that the Labs "cease and desist the unlawful and fraudulent conduct" (Counterclaim 8).

## II.    Analysis

At issue are the following four potential grounds for dismissal raised by the Labs: (1) ERISA preempts all of United's state-law counterclaims, save for its tortious interference claim (Counterclaims 1-3, 5-6), and so these state law claims must be dismissed or converted to claims under ERISA Section 503(a)(3) (29 U.S.C. § 1132(a)(3)); (2) United lacks standing to bring its state law claims; (3) United's state law claims for fraud as well as for fraudulent non-disclosure and negligent misrepresentation fail Rule 9(b)'s heightened pleading requirements, and United's claim for tortious interference with contracts similarly fails for lack of specificity under Rule 12(b)(6); (4) all claims for which United seeks to recover overpayments made with

respect to self-funded plans it administered must be dismissed pursuant to Rule 12(b)(7) because the self-funded plans and their plan-administering employers are necessary parties.

*Preemption*. "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. To this end, ERISA includes expansive pre-emption provisions, *see* ERISA § 514, 29 U.S.C. § 1144, which are intended to ensure that employee benefit plan regulation would be 'exclusively a federal concern.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523 (1981)). "There are two types of ERISA preemption," *E.I. DuPont de Nemours & Co. v. Sawyer*, 517 F.3d 796, 799 (5th Cir. 2008), and the Labs' motion invokes them both. "First, ERISA's express preemption clause states that with certain exceptions, ERISA 'shall super[s]ede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.'" *Id.* (ellipses omitted and quoting 29 U.S.C. § 1144(a)). "Second, ERISA's civil enforcement provision, 29 U.S.C. § 1132(a), sets forth a comprehensive civil enforcement scheme that would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." *Id.* at 797 (quotations and brackets omitted). "Accordingly, any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Id.* (quotations omitted).

**A. Conflict Preemption.** The first of the above-described varieties of ERISA preemption is known as "conflict" ERISA preemption. "Conflict preemption, also known as ordinary preemption, arises when a federal law conflicts with state law, thus providing a federal defense to a state law claim, but does not completely preempt the field of state law so as to transform a state law claim into a federal claim." *Arana v. Ochsner Health Plan*, 338 F.3d 433, 439 (5th Cir.

2003). ERISA § 514 preempts state laws that "'relate to any employee benefit plan.'" *Sawyer*, 517 F.3d at 799 (quoting 29 U.S.C. § 1144(a)). The real work, however, lies with determining what it means for a state law to "relate to any employee benefit plan."

"The Supreme Court has 'observed repeatedly that this broadly worded provision [*i.e.*, 29 U.S.C. § 1144(a),] is 'clearly expansive.'" *Id.* (quoting *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 146 (2001)). Although undoubtedly expansive, conflict preemption "does not occur if the state law has only a tenuous, remote, or peripheral connection with covered plans." *Mayeaux v. La. Health Serv. & Indem. Co*., 376 F.3d 420, 432 (5th Cir. 2004) (ellipses and quotations omitted). Indeed, the Supreme Court has cautioned that "the term 'relate to' cannot be taken to extend to the furthest stretches of its indeterminacy, or else for all practical purposes pre-emption would never run its course." *Egelhoff*, 532 U.S. at 146 (quotations omitted).

Ultimately, lower courts are to "look both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." *Sawyer*, 517 F.3d at 799. Congress's objectives for ERISA were to:

> "protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts."

*Id.* (quoting 29 U.S.C. § 1001(b)).

With these objectives in mind, the Fifth Circuit has adopted a two-part test for conflict preemption. Under it, "[t]he defendant must prove that: (1) the state law claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claim directly affects the relationships among traditional ERISA entities—the

employer, the plan and its fiduciaries, and the participants and beneficiaries." *Id.* (quotations omitted). "ERISA preemption is an affirmative defense." *Bank of La. v. Aetna US Healthcare Inc.*, 468 F.3d 237, 242 (5th Cir. 2006). The Labs, therefore, bear the burden of proof on both of these elements. *Id.* The Labs fail to carry this burden at this time.

**1.** To begin, the Labs fail to show that United's state-law claims for fraud, violation of the Texas Theft Liability Act, negligent misrepresentation, unjust enrichment, and money had and received address an area of exclusive federal concern. The Labs' argument, in essence, is that preemption is warranted because here "an ERISA plan forms the basis of the relationship between the plaintiffs[s] and the defendant." *Blue Cross & Blue Shield of Mississippi v. Sharkey-Issaquena Cmty. Hosp.*, No. 3:17-CV-338-DPJ-FKB, 2017 WL 6375954, at *4 (S.D. Miss. Dec. 13, 2017). Applied here, the Labs' argument touches areas of federal concern in a way that is simply "too tenuous, remote, or peripheral . . . to warrant a finding that the [state] law relates to the plan." *Smith v. Texas Children's Hosp.*, 84 F.3d 152, 155 (5th Cir. 1996) (quotations omitted).

The Labs' acknowledge that whether state claims implicate an area of federal concern often turns on "whether the state law claims are 'bound up with interpretation and administration of the ERISA plan.'" Mot. at 6-7 (quoting *Nixon v. Vaughn*, 904 F. Supp. 2d 553, 561 (W.D. La. 2012)). This is consistent with Fifth Circuit decisions recognizing that state law claims either requiring inquiry into plan administration or challenging a denial of benefits under an ERISA plan can implicate an area of federal concern. *See, e.g.*, *Bank of La.*, 468 F.3d at 242; *Smith*, 84 F.3d at 155 (citing cases). But the Labs go too far in arguing that claims "based on alleged misrepresentations regarding the submission of claims for benefits under ERISA plans" are necessarily bound up with interpretation and administration of the plan. Mot. at 8.

State law claims that touch on claims submission but challenge only the scope of representations made about plan coverage, the Fifth Circuit has held, may not implicate an area of federal concern. *See, e.g.*, *Bank of La.*, 468 F.3d at 243 (holding claims not preempted because the "claims do not challenge any act or omission by Aetna in processing benefit claims or administering the Plan; rather, they call into question Aetna's representations about the scope of the stop-loss extension"). The distinction, reflected in the Fifth Circuit case law, between state law claims based on representations about the scope of plan coverage and ones involving a dispute over actual plan interpretation or application is also reflected in lower court decisions in this circuit, as well as decisions from courts across the country. Where an ERISA plan merely provides the "context" of an alleged fraudulent scheme and a state law claim does not necessarily implicate a dispute over the interpretation or application of plan terms, a party seeking to show conflict preemption may very well struggle to carry its burden.[3]

---

[3] *See, e.g., Aetna Life Ins. Co. v. Humble Surgical Hosp., LLC*, No. CV H-12-1206, 2016 WL 7496743, at *3 (S.D. Tex. Dec. 31, 2016), *appeal dismissed sub nom.*, No. 17-20123, 2017 WL 3753665 (5th Cir. Apr. 5, 2017) (finding no preemption where insurer brought state-law claims to recoup money it improperly paid because of provider's fraud; "Aetna's claims do not seek to enforce the plans. Aetna wants to recoup the money Humble tricked it into paying for no benefit at all to the patients; the plans are merely the context of Humble's fraud"); *Fustok v. UnitedHealth Grp., Inc*., No. 12-CV-787, 2013 WL 2189874, at *5 (S.D. Tex. May 20, 2013) (plan administrator's state law tort claims against provider were not preempted because "[w]hether [the provider's] billing practices 'are tortious does not require interpretation of the Plan'") (quoting *Barker v. The Hartford Life & Acc. Ins. Co*., No. CIV.A. 3:06–CV–1514P, 2007 WL 2192298 at *4 (N.D. Tex. Jul. 31, 2007)); *Connecticut Gen. Life Ins. Co. v. Advanced Surgery Ctr. of Bethesda, LLC*, No. CIV.A. DKC 14-2376, 2015 WL 4394408, at *17 (D. Md. Jul. 15, 2015) (refusing to find preemption even though some of the allegations in the complaint referenced ERISA plans because "the core allegations of misconduct" related to "the fraudulent or negligent misrepresentations that the [providers] made to the Cigna entities in order to obtain payments to which they may not have been entitled had they accurately and fully represented the amounts they charged patients"); *Connecticut Gen. Life Ins. Co. v. True View Surgery Ctr. One, LP*, 128 F. Supp. 3d 501, 517 (D. Conn. 2015) (plan administrator's state law fraud claim not preempted where "[t]he crux" of the claim was the provider's alleged fraudulent billing practices"; "[t]he specific terms of the plans are immaterial to resolving the inquiry into the defendants' billing practices and whether the defendants submitted claims reflecting the true

The Labs' motion makes an insufficient showing that United's claims, given a fair reading, implicate a dispute over the interpretation or application of plan terms; the motion instead at most appears only to invoke the plan to the extent it serves as a backdrop for allegations of fraudulent representations about the nature of benefits claims or the veracity of information submitted in connection with such benefits claims. A review of United's state law counterclaims bears this out.

United's fraud and fraudulent nondisclosure claims involve allegations that, for benefits claims submitted to United by the Labs:

- the representations that United's member owed the amounts listed in the claims were false, Counterclaims at ¶¶ 313, 324, 335, 345, 356;

- the representations that the medical providers listed had actually requested and authorized the services were false, *id.* ¶¶ 314, 325, 336, 346, 357; and

- the representations that the services performed were medically necessary were false, ¶¶ 315, 326, 337, 347.

The Texas Theft Liability Act claims involve allegations that the Labs unlawfully obtained property from United "through deception" by creating "numerous false impressions of fact," including that:

- the services billed for in benefits claims submitted to United were necessary, *id.* ¶ 371a;

- the services billed for in the claims submitted to United were lawfully performed, *id.* ¶ 371b;

---

amount of their services"); *Horizon Blue Cross Blue Shield of New Jersey v. Transitions Recovery Program*, No. CIV. 10-3197 RBK/KMW, 2011 WL 2413173, at *9 (D. N.J. Jun. 10, 2011) (ERISA's fundamental concerns not implicated by plan administrator's allegations that defendant fraudulently misrepresented subscribers received treatment, and in reliance on these misrepresentations, the plan paid millions of dollars on these claims; the ERISA plan was "only the context in which [the] garden variety fraud occurred") (quoting *Geller v. Cnty. Line Auto Sales, Inc.*, 86 F.3d 18 (2d Cir. 1996)).

- each lab submitting a claim for benefits had a lawfully obtained, legitimate assignment or authorization to collect benefits from United for the services, *id.* ¶ 371c;

- the amounts in claims were actually owed by United's members for services rendered by the labs that submitted the claims, *id.* ¶ 371d;

- United's members' insurance benefits would be accepted as payment for testing services and the members would have no payment obligations, *id.* ¶ 372; and

- The Labs promised performances that they did not intend to perform, knew would not be performed, and did not actually perform, *id.* ¶ 373.

The negligent misrepresentation claims involve allegations that the Labs made numerous misrepresentations to United, including that United's members owed the amounts listed in the benefits claims; that the medical providers listed had requested or authorized the services; and that the services performed were necessary. *Id.* ¶ 382.

The claims for unjust enrichment and for money had and received simply refer back to the other claims, asserting that the Labs "have been unjustly enriched as a result of their unlawful, fraudulent, unfair, deceptive, deceitful, and otherwise unconscionable conduct" and seeking to "recover the actual, consequential, and incidental damages and costs incurred as a result of the fraudulent scheme as alleged." *Id.* ¶¶ 397-98, 401-06.

In each instance outlined above, the state law claims do not appear to turn on or necessarily implicate any dispute over the interpretation or application of plan terms. This is not to say that some or all of these claims could never implicate plan terms or their interpretation or application. But at this time the Labs' motion simply does not sufficiently explain why the state laws at issue don't have "only a tenuous, remote, or peripheral connection with [ERISA] covered plans.'" *Mayeaux*, 376 F.3d at 432 (quotations omitted); *Sharkey-Issaquena*, 2017 WL 6375954, at *4 (finding no preemption regarding similar state law claims brought by a plan administrator against two of the same Labs and noting that "courts have rejected similar arguments that

preemption exists [simply because] an ERISA plan forms the basis of the relationship between the plaintiff and the defendant").[4]

In reaching this conclusion, the undersigned recognizes that United references some plan terms in various portions of its Counterclaims. But the crux of United's counterclaims at this time appears to relate to the Labs' alleged fraudulent or negligent misrepresentations. These are allegations about information submitted to the plans, not allegations about how information should have been processed or how the plans should be interpreted vis-à-vis that information. Further, in addition to its state law claims United also seeks a declaration under ERISA that the claims it *denied* were properly denied and a permanent injunction, prohibiting the Labs from submitting claims that violate the terms of its plans. *See* Counterclaims 7 and 8 (¶¶ 406-418). It is these claims, not United's state law claims, that will require construction of the plan terms.

Because the Labs have failed to show United's state law claims address an area of federal concern, their motion fails. *See Bank of La.*, 468 F.3d at 242 (explaining that a party arguing for preemption bears the burden on both elements). Nevertheless, for the sake of completeness, the undersigned will address the second element of the conflict-preemption test—whether United's claims directly affect the relationships among traditional ERISA entities. *See Access Mediquip, L.L.C. v. UnitedHealthcare Ins. Co.*, 698 F.3d 229, 230-31 (5th Cir. 2012) (en banc) (Jolly, J., concurring) (urging the governing test's formulation be disjunctive rather than conjunctive).

**2.** "For purposes of ERISA preemption" and the second part of the conflict-preemption test, "the critical distinction is not whether the parties to a claim are traditional

---

[4] *See also, e.g.*, *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 380-86 (5th Cir. 2011), *adhered to on reh'g en banc*, 698 F.3d 229 (5th Cir. 2012) (finding no preemption where [c]onsultation of the plans' terms is [ ] not necessary to evaluate whether" statements by a plan administrator's agent "were misleading"); *Transitional Hosps. Corp. v. Blue Cross,* 164 F.3d 952, 954-55 (5th Cir. 1999); *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 246 (5th Cir. 1990).

ERISA entities in some capacity, but instead whether the relevant state law affects an aspect of the relationship that is comprehensively regulated by ERISA." *Bank of La.*, 468 F.3d at 243. Nevertheless, third-party providers such as the Labs are not traditional ERISA entities, *see Mem'l Hosp. Sys.*, 904 F.2d at 249, and, moreover, no part of the ERISA statutory framework regulates the accuracy of information supplied by plan participants or their assignees, *see Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 775 n.7 (7th Cir. 2002) (citing 29 U.S.C. §§ 1021-1031). Further, as recognized by the Southern District of Florida in *UnitedHealthcare Ins. Co. v. Sky Toxicology*, United does not appear to be acting as a plan fiduciary with respect to its state law tort claims. 2016 WL 8969042, at *2 ("In light of Plaintiffs' position, and the legal authority on which they rely, the Court concludes that Plaintiffs have not brought their state law claims in their capacity as ERISA fiduciaries."). Accordingly, the Labs have failed to prove that holding a third-party provider here responsible for alleged fraudulent misrepresentations and omissions under Texas law affects a relationship regulated by ERISA. *See Lewis v. Bank of Am. NA*, 343 F.3d 540, 544 (5th Cir. 2003) ("Congress clearly did not intend to broadly immunize non-fiduciary parties . . . from liability under traditional state law contract and tort causes of action.").[5]

---

[5] Many district courts have reached a similar conclusion in cases involving analogous factual scenarios. *See, e.g., Sharkey-Issaquena*, 2017 WL 6375954, at *8 ("Blue Cross was not acting as a plan fiduciary with respect to the specific breaches it alleges—claims seeking damages for *Blue Cross's losses* in paying claims that it says were not covered by the Contract or were fraudulently submitted") (emphasis in original); *United Healthcare Servs., Inc. v. Sanctuary Surgical Ctr., Inc.*, 5 F. Supp. 3d 1350, 1363 (S.D. Fla. 2014) (insurer's state law fraud claims against provider for allegedly submitting bills failing to disclose that the procedure was the direct result of an illegal kickback and fee-splitting arrangement, and misrepresenting the identity of the medical provider, the patient's diagnosis and condition, and the procedures performed were not preempted because the case "involve[d] state law tort claims lodged solely against non-ERISA entities"); *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, No. 13-CV-3422-WJM-CBS, 2015 WL 1041515, at *7 (D. Colo. Mar. 6, 2015) (insurer's state law claims against provider for fraud and unjust enrichment not preempted where the provider failed to explain how

**B. Complete Preemption.** The second type of ERISA preemption implicated by the Labs' motion is complete preemption. ERISA may occupy a particular field, which results in ERISA's civil enforcement provision in § 502(a) (29 U.S.C. § 1132(a)) completely preempting state law claims in the field. *See Giles v. NYLCare Health Plans, Inc*., 172 F.3d 332, 337 (5th Cir. 1999). "This functions as an exception to the well-pleaded complaint rule; 'Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character.'" *Id.* (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 64-65 (1987)). "[B]ecause such a claim presents a federal question, it provides grounds for a district court's exercise of jurisdiction upon removal. *Id.*

But "complete preemption is jurisdictional in nature rather than an affirmative defense to a claim under state law." *Johnson v. Baylor Univ*., 214 F.3d 630, 632 (5th Cir. 2000). In other words, complete preemption is not in these circumstances a way to dismiss state-law claims altogether. *See Spear Mktg., Inc. v. BancorpSouth Bank*, 844 F.3d 464, 468 n. 3 (5th Cir. 2016) (contrasting complete preemption, which "establishes federal subject matter jurisdiction over a state law claim," from ordinary, conflict preemption, which "is an affirmative defense that a defendant can invoke to defeat a plaintiff's state-law claim on the merits by asserting the supremacy of federal law") (quotations omitted).

If complete preemption is jurisdictional in character—and does not supply an affirmative defense through which a merits dismissal of claims could be had—it appears to have little role to

---

the claims "affect[ed] the relations among the principal ERISA entities"; [t]he mere fact that the plan is associated with the claims, or that the plan is factually tied to the alleged tortious conduct, does not make them "relate[d] to" ERISA); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc*., No. CV1403053MWFVBKX, 2015 WL 12778048, at *26 (C.D. Cal. Oct. 23, 2015) (state law fraud claims based on allegation that out-of-network provider submitted false bills to United, a claims administrator not preempted where the "alleged improprieties took place in the context of a relationship that, in and of itself, is not regulated by ERISA").

play here. Federal question jurisdiction is not in dispute; the Labs raise ERISA claims, and the Court can exercise supplemental jurisdiction over counterclaims even assuming they arise under state law. Accordingly, an analysis for complete preemption is unnecessary for purposes of establishing federal jurisdiction and also likely unnecessary as a basis for dismissing certain state-law claims from the case.[6] The Labs, moreover, offer no compelling reason to otherwise conduct a full blown complete-preemption analysis. *See Woods v. Texas Aggregates, L.L.C.*, 459 F.3d 600, 603 (5th Cir. 2006) (observing that the set of claims subject to complete preemption "will rarely, if ever differ from the set of claims [subject to conflict-preemption]").

Some additional brief discussion is warranted, however, concerning the Labs' request that United's state law counterclaims be recharacterized as federal claims under ERISA. *See* Mot. at 10-12. The Labs urge that "complete preemption applies when . . . (1) the plaintiff, at some point in time, could have brought his claim under 29 U.S.C. §1132(a); and (2) there is no other independent legal duty that is implicated by a defendant's actions." Mot. at 10-11 (citing *Davila*, 542 U.S. at 210). The Labs further contend that complete preemption applies and requires recharacterization whenever an insurer seeks damages for money paid to an alleged tortfeasor under and ERISA-governed plan. *See* Repl. at 2-3 & n.1 (citing cases the Labs describe as "call[ing] for complete preemption when the insurer seeks damages for monies paid to an alleged tortfeasor under an ERISA-governed plan"). The Labs' argument goes too far.

---

[6] *See Haynes v. Prudential Health Care*, 313 F.3d 330, 334 (5th Cir. 2002) (recognizing that because diversity jurisdiction existed, "there are no questions of jurisdiction to invoke an analysis of complete preemption on these facts consistent with § 502(a)"); *Blab T.V. of Mobile, Inc. v. Comcast Cable Commc'ns, Inc.*, 182 F.3d 851, 854-55 (11th Cir. 1999) ("complete preemption functions as a narrowly drawn means of assessing federal removal jurisdiction, while ordinary preemption operates to dismiss state claims on the merits and may be invoked in either federal or state court") (citing *McClelland v. Gronwaldt*, 155 F.3d 507, 512 (5th Cir. 1998), *overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003)); *Hall v. NewMarket Corp.*, 747 F. Supp. 2d 711, 715 (S.D. Miss. 2010) (declining to conduct a complete preemption analysis where subject matter jurisdiction already existed).

As discussed previously, it is not the meaning of plan terms or plan administration that is the crux of the present dispute. The state law claims here are essentially akin to garden variety fraud claims that happen to occur in the context of an ERISA plan. Put another way, these claims are premised on a legal duty—sounding in tort—distinct from a duty under the plans. *See N. Cypress Med. Ctr. Operating Co. v. CIGNA Healthcare*, 782 F. Supp. 2d 294, 313 (S.D. Tex. 2011), *aff'd sub nom. N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182 (5th Cir. 2015) ("[T]he question is whether North Cypress's . . . claim is based on an alleged legal duty independent of the relevant employee benefit plans.") (citing *Davila*, 542 U.S. at 210).

*Standing*. The Labs next argue—in tension with the earlier-cited decision from the Southern District of Florida—that United lacks standing to bring its state law claims because it was at all times acting as a plan fiduciary. *Cf. UnitedHealthcare*, 2016 WL 8969042, at *2 ("[T]he Court concludes that Plaintiffs [United] are not fiduciaries for purposes of their ERISA claims . . . ."). According to the Labs, United "invoke[s] its status as a fiduciary when beneficial, yet declares it is acting on its own behalf in regards to state law claims that rely on the exact same factual assertions as the ERISA claims." Mot. at 17. United, according to the Labs, "may not assert these dual roles with regard to the same set of facts to recoup the same alleged overpayments." *Id.* The Labs' argument here apparently misunderstands United's counterclaims.

United's state law counterclaims seek to recover *damages* from the Labs for their violations of Texas common law and statutory duties, which as discussed above, appear to be independent from ERISA and the terms of any plan. In contrast, United's ERISA claims do not seek any damages or recovery of overpayments. Rather, United seeks declaratory relief regarding the propriety of denied claims for which payment did not issue, *see* Counterclaim 7, and injunctive relief regarding future claim submissions, *see* Counterclaim 8. Accordingly, and

contrary to the Labs' assertions, United is only wearing one "hat" for each type of claim. The Fifth Circuit has recognized that "a party may qualify as an ERISA fiduciary with regard to some claims but not others." *Bank of La.*, 468 F.3d at 242. The Labs' argument on standing lacks merit.

*Sufficiency of United's pleadings*. The Labs next challenge the sufficiency of United's pleadings for fraud and fraudulent non-disclosure (Counterclaims 1A-E), negligent misrepresentation (Counterclaim 3), and tortious interference with contract (Counterclaim 4). For the reasons discussed below, the undersigned finds that United's claims for fraud and negligent misrepresentation are properly pled. More factual detail, however, is required with respect to its tortious interference claim. Because this deficiency can be cured, United should be granted leave to amend this claim.

United's fraud and negligent misrepresentation claims are subject to Rule 9(b)'s heightened pleading requirements.[7] Although "[w]hat constitutes 'particularity' will necessarily differ with the facts of each case," *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992), "[a]t a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby," *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc*., 975 F.2d 1134, 1139 (5th Cir. 1992) (quotations omitted). In other words, "Rule 9(b) requires that plaintiffs plead enough facts to illustrate the who, what, when, where, and how of the alleged fraud." *Carroll v. Fort James Corp*., 470 F.3d 1171, 1174 (5th Cir. 2006) (quotations omitted).

---

[7] "Although Rule 9(b) by its terms does not apply to negligent misrepresentation claims, [the Fifth Circuit] has applied the heightened pleading requirements when the parties have not urged a separate focus on the negligent misrepresentation claims." *Benchmark Elecs., Inc. v. J.M. Huber Corp*., 343 F.3d 719, 723 (5th Cir. 2003), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003). That is the case here. United's fraud and negligent misrepresentation claims are based on the same set of alleged facts.

United alleges hundreds of particularized fraudulent acts, each identifying the entity that made the fraudulent submission, the date of the submission, the reason(s) the submission was allegedly fraudulent, and the providers who allegedly participated in the fraudulent scheme. *See* Counterclaims ¶¶ 81-309. United further describes the precise manner in which the Labs allegedly operated this scheme—by inducing medical providers with kickbacks, how the Labs allegedly disguised these kickbacks, and their policy of writing off patient account balances. *See id.* This is sufficient detail. Accordingly, the Labs' argument that these claims fail for lack of specificity is without merit.

United's tortious interference claim, while only subject to Rule 8(a)'s requirements,[8] is nonetheless insufficient as pled. According to United, Plaintiffs Frontier Toxicology, Ltd. and Hill Country Toxicology, Ltd. paid kickbacks to United's contracted network providers in exchange for their out-of-network referrals. This led the providers to breach their contracts with United because these contracts require medical providers to refer United's members to in-network laboratories. Counterclaims ¶¶ 388-395.

To recover for tortious interference with a contract, a plaintiff must prove "(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred." *Amigo Broad., LP v. Spanish Broad. Sys., Inc*., 521 F.3d 472, 489 (5th Cir. 2008) (citing *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)). The Labs argue United has failed to sufficiently plead the first and second elements by failing to identify the specific agreements or their terms subject to interference and how the Labs would

---

[8] *See Leonardo Worldwide Corp. v. Pegasus Sols., Inc*., No. 3:14-CV-2660-N, 2015 WL 13469916, at *2 (N.D. Tex. Jan. 9, 2015) (explaining that Rule 9(b) does not apply to a claim for tortious interference where the claim does not rest on a fraudulent misstatement).

have knowledge of those agreements. The first element is properly pled here. United specifically identifies the providers who had network agreements with it and the general terms that Frontier and Hill Country caused these providers to breach. Although United has not described the contracts in detail, the facts alleged, taken as true, are sufficient to reasonably infer the existence of contracts subject to interference. *See, e.g.*, *Wolf v. Cowgirl Tuff Co.*, No. 1:15-CV-1195-RP, 2016 WL 4597638, at *3 (W.D. Tex. Sept. 2, 2016).

The Labs' objection to the sufficiency of United's pleading of the second element, however, is well-taken. To show a willful and intentional act of interference, "the interfering party must have actual knowledge of the contract or business relation in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship." *Amigo Broad*, 521 F.3d at 490 (quotations omitted). Here, United generally alleges that "Frontier and HCT [Hill Country Toxicology] knew that many medical providers had contracts with UHC [United] that made the medical providers part of UHC's [United's] network." Counterclaims ¶ 388. United, however, has failed to plead any facts suggesting that Frontier and Hill Country Toxicology knew or should have known that the providers *they allegedly targeted* entered into network agreements with United. Accordingly, more is required for United to state a claim for tortious interference that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"). Dismissal, however, at this early stage for a pleading defect that might be easily cured does not appear appropriate. Instead, United should be granted leave to amend. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)

(recognizing that "district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal").

*Motion to Dismiss Pursuant to Rule 12(b)(7).* Finally, the undersigned addresses the Labs' argument that any claims United asserts arising from self-funded plans must be dismissed pursuant to Rule 12(b)(7) because the self-funded plans and their plan-administering employers are necessary parties under Rule 19(a).

Rule 12(b)(7) allows dismissal for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). Rule 19 in turn requires joinder of a person "who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction" if:

> (A)  in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B)  that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> >
> > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

The Labs claim that the self-funded plans and their plan-administering employers are necessary parties under Rule 19(a)(1)(A) and 19(a)(1)(B)(ii), however, they fail to identify any of these entities they believe should be joined as parties. "A prerequisite to a proper dismissal for failure to join an indispensable party is that the absent party, if added, would divest the court of subject-matter jurisdiction." *August v. Boyd Gaming Corp.*, 135 Fed. App'x 731, 732 (5th Cir.

Jun. 22, 2005). By failing to identify these alleged necessary parties, the Court cannot determine whether their joinder would destroy subject-matter jurisdiction. Accordingly, on this ground alone, the Labs' Rule 12(b)(7) motion should be denied. *See id.*; *see also Cooper v. Kliebert*, No. 15-751-SDD-RLB, 2016 WL 3892445, at *6 (M.D. La. Jul. 18, 2016) (denying defendant's Rule 12(b)(7) motion where "[d]efendants failed to identify 'who' the indispensable party is").

Even assuming the Labs satisfied this prerequisite, they also have failed to satisfy their "initial burden of demonstrating that a missing party is necessary." *Hood ex rel. Mississippi v. City of Memphis, TN*, 570 F.3d 625, 628 (5th Cir. 2009). The Labs generally argue that joinder of these absent parties is necessary because their absence "creates a substantial risk of future liability, litigation, and vexation between Plaintiffs and the employers" and any recovery of alleged overpayments made to the Labs would belong "in good conscience" to the self-funded plans and the employers, not United. Mot. at 19-20. But the Labs ignore United's allegation that it enters into Administrative Services Agreements with self-funded plan sponsors, which "typically give UHC [United] the exclusive authority to recover overpayments made on behalf of UHC's [United's] self-funded clients." Counterclaims ¶ 33. Accordingly, it appears that complete relief may be afforded amongst the existing parties and that the Labs will not be subject to inconsistent or overlapping allegations. *See United States v. Rutherford Oil Corp.*, No. CIV.A. G-08-0231, 2009 WL 1351794, at *2 (S.D. Tex. May 13, 2009) ("In ruling on a motion to dismiss for failure to join a necessary and indispensable party, a court must accept the complaint allegations as true.").

For these reasons, the Labs have failed to meet their burden to establish that the self-funded plans and their plan-administering employers are necessary parties under Rule 19 or that they cannot be joined so as to warrant dismissal. S*ee Cooper,* 2016 WL 3892445, at *6

(recognizing that courts are "reluctant" to grant Rule 12(b)(7) motions and that such motions "will not be granted because of a vague possibility that persons who are not parties may have an interest in the action") (quotations omitted); *see also Sharkey-Issaquena*, 2017 WL 6375954, at *10-11 (denying Rule 12(b)(7) motion when faced with similar arguments for dismissal).

### III.     Conclusion

For the reasons discussed above, it is recommended that Plaintiffs' Motion to Dismiss Counterclaims of Defendants Pursuant to FRCP 12(b)(1), 12(b)(6), and 12(b)(7), Dkt. No. 8, be **DENIED**. Defendants, however, should be granted leave to amend their Counterclaims to cure the pleading deficiencies with respect to their tortious interference claim as identified herein.

### Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The objecting party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).

Additionally, failure to timely file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**IT IS SO ORDERED**.

SIGNED this 4th day of September, 2018.

RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE